107 F.3d 923
 323 U.S.App.D.C. 290
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
SIERRA CLUB, et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 No. 95-1562.
 United States Court of Appeals, District of Columbia Circuit.
 Oct. 22, 1996.
 
 Before SILBERMAN, SENTELLE, and TATEL, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came on to be heard on a petition for review of an order of the Environmental Protection Agency, and was briefed and argued by counsel. While the issues presented occasion no need for a published opinion, they have been accorded full consideration by the Court. See D.C.Cir.R. 36(b) (January 1, 1994). On consideration thereof, it is
 
 
 2
 ORDERED and ADJUDGED, by this Court, that the petition for review of the order of the Environmental Protection Agency is hereby denied, for the reasons set forth in the accompanying memorandum. It is
 
 
 3
 FURTHER ORDERED, by this Court, sua sponte, that the Clerk shall withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.R. 41(a)(1) (January 1, 1994). This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.
 
 MEMORANDUM
 
 4
 Petitioners seek review of the Environmental Protection Agency's (EPA) rescission of its rule regulating emissions of radionuclides by nuclear power reactors.
 
 
 5
 In 1990, Congress amended the Clean Air Act to allow EPA to decline to regulate facilities licensed by the Nuclear Regulatory Commission (NRC) if it determines by rule that the NRC's regulatory program provides an "ample margin of safety" to the public health. Clean Air Act § 112(d)(9), 42 U.S.C. § 7412(d)(9) (1994); see also Natural Resources Defense Council, Inc. v. EPA, 824 F.2d 1146, 1164-65 (D.C.Cir.1987) (en banc). Since EPA had, in 1989, determined that a program resulting in an effective dose equivalent of 10 millirem/year for the maximally exposed individual provided an ample margin of safety, it set about to determine whether the NRC's program results in emissions at or below 10 millirem/year.
 
 
 6
 EPA began by determining the actual level of radionuclide emissions generated by nuclear reactors licensed by NRC. Data collected in 1988 indicated that emissions at that time did not exceed one millirem/year, and EPA's review of the reactors at issue indicated that current radionuclide emissions are even lower than in the late 1980s.
 
 
 7
 EPA next identified NRC regulations that control radionuclide emissions from commercial nuclear power plants. The first of these, 10 C.F.R. part 50, Appendix I, takes a carrot and stick approach. Prior to obtaining a license to operate a nuclear reactor, an applicant must satisfy specific design objectives, among which are two of import here. The licensee must demonstrate that gaseous radionuclide releases to the atmosphere will remain below specific levels. Importantly, the NRC may require lower release rates if it appears that releases from the plant are likely to result in an estimated radionuclide dose in excess of five millirem/year effective dose equivalent. The second key design objective requires that the applicant demonstrate that the project will not cause exposures to any individual in excess of 15 millirem/year to, inter alia, the thyroid. A 15 millirem dose to the thyroid is equivalent to a 0.5 millirem effective dose equivalent. EPA concluded that these two design objectives result in a maximum allowable effective dose equivalent of less than six millirem/year. And to ensure that each nuclear reactor meets these design objectives in practice, NRC has promulgated limiting conditions of operation which are used to develop appropriate technical specifications which are included in the facility's license.
 
 
 8
 EPA also relied on 10 C.F.R. part 20, which explicitly requires all licensees to keep radionuclide emissions as low as reasonably achievable (ALARA). This requirement incorporates the standards of Appendix I, discussed above, and, in EPA's view, creates a "high level of assurance" that radionuclide emissions from commercial reactors will not exceed 10 millirem/year.[1] Having determined that NRC "can and will require any licensed nuclear power reactor which has radionuclide emissions resulting in a dose exceeding 10 [millirem]/year to take specific actions which will reduce emissions to a level which results in a dose below 10 [millirem]/year," EPA promulgated a final rule rescinding its 1989 standard for radionuclide emissions from nuclear reactors. See 60 Fed.Reg. 46,206 (1995).
 
 
 9
 Petitioners agree with EPA that the benchmark for comparison between EPA's program and the NRC's program was EPA's 1989 standard of 10 millirem/year. Petitioners disagree, however, with EPA's conclusion that the NRC program satisfies that standard. We find no merit in petitioners' argument.
 
 
 10
 Petitioners complain at the outset that EPA inquired into the quantity of radionuclide emissions produced by the segment of the nuclear power industry subject to NRC's regulatory process. In petitioners' view, § 112(d)(9) required EPA to establish an ample margin of safety standard, and then to assess the effectiveness of the NRC's program in comparison to that standard. Instead, according to petitioners, EPA "reopened the question" whether radionuclide emissions by nuclear reactors warrant regulation. We presume that this complaint derives from that part of the rulemaking in which EPA sought to determine whether radionuclide emissions during routine operations of nuclear power reactors licensed by NRC result in doses greater than 10 millirem/year. We are unpersuaded by this argument. Especially in light of the deference with which we review EPA's implementation of its statutory mandate, it seems to us entirely reasonable that an agency seeking to determine the efficacy of a regulatory program would begin by attempting to quantify what it is that program is regulating and to measure how successfully it is doing its job. Although EPA did not attempt to identify a causal link between the NRC program and the low level of emissions, EPA reasonably concluded that such data was relevant to an evaluation of the effectiveness of NRC's regulation of nuclear reactors.
 
 
 11
 Petitioners further argue that the data on which EPA relied in assessing the current level of radionuclide emissions is faulty. Aside from being "old," however, petitioners do not explain what it is about that data that is objectionable. Presumably, any data from the late 1980s will suffer the same infirmity that petitioners believe undermines EPA's data. We do not think it unreasonable for EPA to rely on relevant, anecdotal evidence simply because that evidence was collected eight years ago. Petitioners do not recognize that in the course of this rulemaking, EPA "conducted a review of the nuclear power segment" prior to reaching the conclusion that current "radionuclide emissions from nuclear power reactors are even lower than were previously estimated." 60 Fed.Reg. at 46,208.
 
 
 12
 Petitioners attack EPA's reliance on 10 C.F.R. part 20 by fixing on its 100 millirem/year standard. They use this figure to argue that the NRC's standards are an "order of magnitude" above the standard previously determined by EPA to be necessary to provide an ample margin of safety. Petitioners ignore, however, the ALARA requirement of part 20. That requirement incorporates the standards set forth in Appendix I which, as noted, set a maximum effective dose equivalent of less than six millirem/year.
 
 
 13
 Finally, petitioners complain that EPA's decision is arbitrary and capricious because EPA did not investigate whether the NRC actually enforces its standards, and because it did not take into account that the NRC's statutory authority, unlike the Clean Air Act, does not contain a citizen-suit provision. The first of these assertions flatly ignores EPA's specific findings, supported by the record, that the NRC has in place procedures which ensure compliance with its regulations. See 60 Fed.Reg. at 46,210 (noting that each facility is subject to at least two inspections per year and that all inspection reports are publicly available); id. at 46,211 (pointing out that NRC "maintains direct oversight of licensed nuclear power reactors"). And the latter complaint misunderstands Congress' mandate to EPA when it enacted § 112(d)(9) of the Clean Air Act. EPA was surely correct to conclude that Congress did not require it to establish exact equivalence between administration of the Clean Air Act and the NRC's regulatory process. Any other conclusion would render § 112(d)(9) meaningless. We must assume that Congress, having created the EPA and the NRC, was well aware that their enabling statutes took somewhat different approaches to enforcement. In allowing EPA to decline to regulate facilities regulated by the NRC, Congress authorized EPA to make a judgment about the efficacy of the NRC's regulatory program. EPA has done that, and petitioners have shown us no evidence, and we are aware of none, to suggest that judgment is unreasonable.
 
 
 14
 We deny the petition.
 
 
 
 [1]
 The final prong of NRC's regulatory program relied on by EPA is 10 C.F.R. part 190, which limits both gaseous and liquid radiation exposure from all uranium fuel cycle sources (not just a single commercial nuclear reactor) to 25 millirem/year to the whole body, 75 millirem to the thyroid, and 25 millirem to any other organ